## EDWIN J. ROEDER v. IRA KRUGER, ALSO KNOWN AS THE ASSOCIATED ICE COMPANY, AND ANOTHER.[1]

December 27, 1946.

Nos. 34,273, 34,274.

*Carl J. Eastvold* and *C. J. Benson,* for relator Edwin J. Roeder.
*E. V. Cliff,* for relator Ira Kruger.
*Reynolds & McLeod,* for Liberty Mutual Insurance Company, respondent.

---

[1]Reported in 25 N. W. (2d) 686.

CHRISTIANSON, JUSTICE.

Certiorari to review an order of the industrial commission awarding compensation to employe against employer and discharging insurer from liability therefor.

This proceeding arises from two petitions for review by certiorari, one on the relation of Edwin J. Roeder, employe, and the other on the relation of Ira Kruger, also known as The Associated Ice Company, the employer. The same question being presented by both petitions, the matters were consolidated for hearing here and will be covered by only one opinion.

The employer, Ira Kruger, a resident of Aberdeen, South Dakota, was on January 17, 1944, and for some years prior thereto had been, conducting an ice business, and on that date was engaged in harvesting ice on Big Stone Lake at Ortonville, Minnesota. He had in his employ Edwin J. Roeder, who was very severely cut and injured on that day by the ice saw used in the ice-harvesting operations.

On petition of the injured employe, hearings were had before a referee, who made an award of compensation to the employe against the employer and the insurer, Liberty Mutual Insurance Company. From such decision, the insurer appealed to the industrial commission, which, on March 22, 1946, reversed in part the decision of the referee by awarding compensation to the employe against the employer, but dismissing the employe's petition against the insurer on the ground that at the time of the accident in question the employer was not insured for workmen's compensation.

To review the decision of the commission, the employe and the employer each brought the matter here on certiorari.

The sole question presented for review is whether the employer was insured by the insurer at the time of the accident in question.

Inasmuch as the record reveals that the Minnesota compensation rating bureau was involved in the steps taken to secure continued compensation insurance coverage for the employer, it is desirable at this point that the legal status and powers of the rating bureau be briefly alluded to.

The compensation rating bureau was created by statute for the purpose of assuring, as far as possible, financial responsibility for compensation payments to injured employes in employments rejected by insurer as undesirable risks. The legislature made it mandatory upon compensation insurers as a whole, through the medium of the bureau, to devise ways and means for issuing policies to these undesirable risks. To effectuate this purpose, the legislature, recognizing the difficulty attending such business, empowered the bureau to make rules and regulations governing the issuance of such policies. The rules of such bureau, insofar as involved in the matter before us, seem to have been fair and reasonable.

The rules of the bureau and its powers and duties have been heretofore considered by this court in the case of Yoselowitz v. Peoples Bakery, Inc. 201 Minn. 600, 606-608, 277 N. W. 221, 225, where this court there said relative to the rating bureau:

"* * * Being the creature of statute and a quasi public agency, it has only the powers and duties conferred upon it by law. * * *

"We need consider only in this connection the bureau's power to designate carriers of rejected risks under the statute. It is not a general insurance agency with powers possessed by general insurance agents to represent insurance companies, write insurance, transfer policies, receive notices, and represent companies in connection with business handled through it by them. No such agency was ever contemplated, and the bureau is not such. L. 1929, c. 237, provides that insurers carrying compensation insurance who are members of the rating bureau are under a duty to insure and accept any workmen's compensation risk if designated to do so by the bureau in the manner provided in the statute, which is that if a risk be tendered and rejected by three members of the bureau it may be assigned to a carrier if it appears that the applicant is in good faith entitled to coverage. Upon having its attention called to the matter, it is the duty of the bureau to fix the initial premium and designate the member whose duty it shall be to issue a policy of insurance to the applicant, containing the usual and customary provisions found in such policies. The bureau has adopted rules

pursuant to the statute, which then provided that the applicant shall submit a verified application on a form prescribed by the bureau, containing information pertaining to the particular employer, three letters of declination from compensation insurers stating that they have declined to insure the particular risk, and a certified check or money order payable to the bureau to cover the initial premium, following which the bureau then designates and notifies one of its members to insure the particular risk, effective at 12:01 a. m. the day following. All compensation insurers are members of the bureau and are required by the statute to file their consents authorizing the bureau to act in their behalf in accordance with the provisions of the statute. * * *

"The authority of the bureau being wholly statutory, it must be exercised in conformity to the statute. [Citing cases.] Full compliance with the terms of the statute was requisite to authorize the bureau to designate a carrier. Whether the statute be mandatory or directory in its requirements is not controlling. The statute commands obedience, otherwise it would not have been enacted. The rule by which statutes are held to be directory as to certain requirements is to sustain action after the act against failure to comply with the statute in certain respects, but never to compel noncompliance in any respect before the act. It would seem to be the duty of courts to compel obedience, not disobedience, to the commands of the statute and to sustain action justified by insistence on compliance with law."

The rules of the bureau prior to September 1, 1943, provided that each risk assigned by the bureau to a member became the actual risk of that individual member, and all profits or loss resulting from such risk became the loss or profit of such individual member insurer.

Effective as of September 1, 1943, however, the bureau set up a new plan for dealing with assigned risks, now commonly referred to as the "pool plan." The procedure for the obtaining of a risk by the employer was not changed. Such new plan, however, provided that the bureau would designate four servicing companies

from among the bureau membership who would issue policies on all of the assigned risks, but with a rider attached to indicate that the company issuing the policy did so as agent for and on behalf of the bureau under the pool plan. The premium rates under this new arrangement were to be the full rates for the individual risks and classifications, and none of the policies so issued were to be entitled to participate in any dividends, as had been the procedure theretofore. Under such pool plan, every bureau member became in fact a participating underwriter with every other member. Under such plan, the servicing company receives a certain percentage of the premium for its writing and servicing of the risk. The balance of the premium is credited by the bureau to a separate account, and all bureau members share in the profit or loss resulting from such assigned business. Through this method, every compensation insurer in the state shares in the business of providing compensation coverage for each deserving employer and his employes who are otherwise unable to secure coverage.

It appears that the employer here, during 1943, carried compensation insurance with the Liberty Mutual Insurance Company to cover his ice-harvesting operations, such coverage having been by assignment, and that in October 1943, while the policy was in force, the employer called at the office of the insurer in Chicago with respect to a renewal of the insurance when the policy then in force would expire on January 15, 1944. There was evidence to the effect that at such time a certain Mr. Perry, representing the insurer, assured the employer that the insurer would continue the coverage.

On November 15, 1943, it appears that the insurer advised the Minnesota compensation rating bureau by letter as follows relative to the employer's coverage:

"In accordance with the rules of the Minnesota Assigned Risk Plan, please consider this letter as notification, as required by rule 60, of our willingness to renew upon reassignment.

"Unless we have a letter of re-assignment from you, our policy WC-04-04741-Minn. will be terminated on January 15, 1944. We

assume that you will notify the employer what should be done to continue his protection beyond that date."

It then appears that on December 21, 1943, pursuant to the foregoing letter, the Minnesota compensation rating bureau notified the employer by letter as follows:

"It has been brought to our attention by Liberty Mutual Insurance Co. that their policy terminating Jan. 15, 1944 will not be renewed as regular business. It is our suggestion that you contact local insurance solicitors and endeavor to arrange for your compensation insurance coverage effective as of the termination date of your present policy.

"If you are unsuccessful in making such arrangements, you may complete the enclosed application in duplicate and file both copies with this Bureau accompanied by a letter from the insurance company or the company's solicitor indicating that this company or its authorized representative has refused to issue a Workmen's Compensation Insurance policy.

"If it is necessary for you to follow this plan, we recommend that the enclosed application in duplicate be furnished us at least ten days before your present policy expires. In the event we hear nothing further from you, we shall assume that you have taken care of your obligations satisfactorily without any assistance from this Bureau."

It further appears that on December 30, 1943, insurer advised the employer by letter as follows:

"We issued the above policy in accordance with the rules of the Minnesota Assigned Risk plan. Effective September 1, 1943 the program regarding the handling of such business was revised.

"If you will have need for Workmen's Compensation insurance in the state of Minnesota after January 15, 1944 and are unable to secure such coverage direct with some company licensed to do business in Minnesota it will be necessary for you to make application to the Minnesota Compensation Rating Bureau, 523 Marquette Avenue, Minneapolis, Minnesota.

"While we are entirely willing to continue your coverage on an assigned basis we are not in a position to write your business as a direct account."

It then appears that after receipt of the two letters last mentioned the employer sought the assistance of the Narregang Insurance Agency of Aberdeen, South Dakota, in getting compensation coverage. On January 11, 1944, the rating bureau received a letter from the Narregang agency, the contents of which letter are of significance here and are as follows:

"We are enclosing application in duplicate for Ira Kruger covering his ice cutting operations at Ortonville, Minnesota.

"His present policy with the Liberty Mutual Insurance Co. will expire on January 15, 1944 and we would appreciate your making an assignment and advising us as to the company assigned to this risk.

"Please send the policy to our office and we will immediately send a check covering the premium. We would appreciate hearing from you."

The application therein referred to was an application to secure insurance through the bureau by assignment.

On January 11, 1944, the Minnesota compensation rating bureau advised the Narregang agency by letter, the first paragraph of which reads as follows:

"We have for acknowledgment your letter of the 10th and new application of this assured, for if continuous coverage is to be provided, before we can arrange for insurance again, we must have certified check, bank draft or money order in the amount of $318.65, and if by check it must be certified, and in our hands by no later than January 14th."

It will be noted that in the foregoing letter the rating bureau specifically indicated that it was necessary that the premium of $318.65 be sent by certified check to the bureau to be in its hands not later than January 14. Such remittance, however, was not made as requested.

On January 17, 1944, two days after the expiration date of the employer's workmen's compensation policy, which had been in force for the year prior to January 15, 1944, the employe was severely injured in the course of his employment in the ice-harvesting operations of the employer as hereinbefore stated. On January 20, 1944, the employer, through the Narregang agency, sent a check for $318.65 to the rating bureau, which payment presumably was the requested advance premium on the policy applied for in the employer's application as made to the bureau under date of January 10, 1944. The check, however, was promptly returned to the Narregang agency by the bureau because it had not been certified and was not payable to the bureau. In the letter returning such check, the bureau again stated that it should be made payable to the Minnesota compensation rating bureau and should be certified. It also stated that the bureau could not comply with the insured's request to bind coverage as of January 15, 1944, and that the coverage would not become effective until 12:01 a. m. of the day following receipt of proper remittance to cover the deposit premium. On January 24, 1944, the rating bureau received a bank draft for the required amount of the premium, and coverage was placed on the risk of the employer in accordance with the rating bureau's rules within 24 hours, effective January 25, 1944.

It is the contention of employer that the insurer is estopped to claim that the policy in question was not in force and effective on January 17, 1944, the date of the accident in question. He asserts that the insurer renewed the policy of insurance as had been previously agreed by it in October 1943, but that it dated the renewal contract January 25, 1944, and not January 15, 1944, as it had previously agreed to do. Employer further asserts that it was not necessary for him to pay the initial premium as required by the rules of the rating bureau, for the reason that the rule was merely directory and that it had been waived by the conversation employer had had with the insurer's representative in Chicago and by the designation of the insurer as the assigned risk. Employer asserts that any other position would be contrary to the intent and purpose

of the workmen's compensation act and would be contrary to the intentions of the insurer itself and of the employer, Ira Kruger.

We do not believe that there is merit in such contentions of the employer. Estoppel cannot here be asserted, in view of the fact that, even though it be assumed that the conversation referred to was in fact had, the subsequent advice of the insurer to the effect that it could not carry the insurance further as a direct risk, but that it would have to be on an assigned basis, was given to the employer by the rating bureau and the insurer in ample time to enable the employer to comply with the requirements, and it is significant that after receipt of such advice the employer no longer relied upon the alleged Chicago conversation, but proceeded to act to comply with the bureau rules with respect to having the risk carried on an assigned basis. Such fact is undisputed and negatives completely the employer's claim of estoppel. The contention that the employer had a credit with the insurer on account of a participating policy theretofore carried by the employer with the insurer, so as to compel the insurer to extend the risk by application of such credit on the premium, is also without merit in this case. The amount of credit due the employer was entirely dependent upon an audit still to be made at the time of the accident in question. The insurer could not be required to extend the coverage by reason of a credit the existence and amount of which had not been ascertained. Furthermore, under the statutes governing the conduct of the rating bureau, there is no real assignment of the risk until the employer to be covered has paid the initial premium. We refer to Minn. St. 1945, § 70.25,[2] which reads in part as follows:

"When any such rejected risk is called to its attention and it appearing that the risk is in good faith entitled to coverage the bureau shall fix the initial premium therefor and, upon its payment, the bureau shall designate a member, whose duty it shall be to issue a policy * * *."

[2]See, M. S. A. § 70.25, and cf. Mason St. 1940 Supp. § 3634-2.

In the instant case, the foregoing statutory requirement was not complied with by the employer until January 24, 1944. For this dereliction of the employer, no one can be held accountable except the employer himself. An employer is required under the statute to carry compensation insurance for the protection of his employes, unless he has obtained an order from the industrial commission exempting him from insuring his liability for compensation and permitting him to self-insure such liability in the manner set forth in the statute. There is no requirement in the compensation law to the effect that an insurer must issue a new policy to an employer on the expiration of the one currently in effect. The insurer here was clearly within its rights in refusing to issue a new policy to the employer in this case. Under the circumstances, we are compelled to find that the Liberty Mutual Insurance Company was not the insurer of Kruger on January 17, 1944.

There is no merit in the claim that the employer here did not appreciate the significance of the requirements of the rating bureau's rules and the statutes relative to such rating bureau. It appears that he had been covered as an assigned risk in previous years and that he was advised of the new bureau rules which were effective as of September 1, 1943. Both employe and employer argue that the liberal rules prevailing with respect to the interpretation of the workmen's compensation law require that we here impose the insurance liability sought upon the insurer as of January 15, 1944.

This court has repeatedly enunciated the proposition that the workmen's compensation act, being highly remedial, must be liberally construed to carry out the purpose of the law. No rule of liberality, however, would justify an attempt on our part to impose an insurance contract upon the insurance company as of January 15, 1944, for the purpose of preventing, at the expense of the insurance company, a break in coverage caused, not by neglect of the insurance company, but by the employer himself.

The case of Annala v. Bergman, 213 Minn. 173, 176, 6 N. W. (2d) 37, 39, greatly relied upon by the employer as authority for the

proposition that the policy should have been made effective as of January 15, 1944, so as to have prevented a lapse, is not here applicable. In that case, this court said:

"* * * We hold therefore that an insurer, if he chooses to reinstate a cancelled policy, must do so as of the date of the cancellation and is not permitted to designate a day anything short of that time. The coverage must be continuous, not interrupted by intervals during which no insurance exists. *Of course this applies solely to a reinstatement under terms creating an interruption of coverage during a policy year.*" (Italics supplied.)

Writs discharged and order of commission affirmed.